IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEBBIE HARLOW,                                           3:11-CV-01262 RE

                    Plaintiff,                          OPINION AND ORDER

          v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

REDDEN, Judge:

Plaintiff Debbie Harlow ("Harlow") brings this action to obtain judicial review of a final

decision of the Commissioner of the Social Security Administration ("Commissioner") denying

her claim for Disability Insurance Benefits and Supplemental Security Income benefits. For the

reasons set forth below, the decision of the Commissioner is affirmed and this matter is

dismissed.

1  - OPINION AND ORDER

## BACKGROUND

Born in 1957, Harlow completed a general equivalency degree, and has past relevant work as a cashier assistant, a customer service representative, and a courier. In October 2004, Harlow filed an application for social security income and disability insurance benefits, alleging disability since February 26, 2004. Tr. Her application was denied initially and upon reconsideration. After a November 2006 hearing, an Administrative Law Judge ("ALJ") found her not disabled. Harlow's request for review was granted, and the Appeals Council remanded the case for a new hearing. A second hearing was held in July 2008. Her application was again denied, as was her request for review, making the ALJ's decision the final decision of the Commissioner.

## ALJ's DECISION

The ALJ found Harlow last met the insured status requirements of the Social Security Act on September 30, 2005, and that she had not engaged in substantial gainful activity from her alleged onset date of February 26, 2004 through her date last insured. Tr. 18-19.

The ALJ determined that Harlow had no medically determinable severe impairments.

The medical records accurately set out Harlow's medical history as it relates to her claim for benefits. The court has carefully reviewed the extensive medical record, and the parties are familiar with it. Accordingly, the details of those medical records will be set out below only as they are relevant to the issues before the court.

## DISCUSSION

Harlow contends that the ALJ erred by: (1) failing to find severe impairments at step two; (2) improperly weighing medical evidence; and (3) failing to credit lay testimony.

2 - OPINION AND ORDER

## I. Step Two

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert,* 482 US 137, 140-41 (1987). The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." According to the regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." 20 CFR § 404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 CFR §§ 404.1521(b); 416.920(c).

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Yuckert,* 482 US at 153-54. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work." *See* SSR 85-28; *Yuckert v. Bowen,* 841 F2d 303, 306 (9th Cir 1988) (adopting SSR 85-28). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, and cannot be established on the basis of a claimant's symptoms alone. 20 CFR § 404.1508.

Harlow contends that the ALJ erred by failing to find that her adjustment disorder, panic disorder, and conversion disorder are "severe" impairments.

## A. The Medical Evidence

Disability opinions are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician.

*Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). In such circumstances the ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* But, if two medical source opinions conflict, an ALJ need only give "specific and legitimate reasons" for discrediting one opinion in favor of another. *Id.* at 830. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

The ALJ found that Harlow had the medically determinable impairments of panic disorder and adjustment disorder, among others. Tr. 19.

### (1)  Duane D. Kolilis, Ph.D.

Dr. Kolilis reviewed a limited number of records and examined Harlow in July 2005. Tr. 514-19. He stated her "demeanor was angry, belligerent, and passive-aggressive. She was guarded, evasive, and vague in her responses." Tr. 516. Dr. Kolilis saw no evidence of psychomotor agitation. Harlow sat through the interview without observable discomfort. Her posture was normal, her gait was slow and she touched the wall as she left. *Id.*

Harlow reported depression and suicidal ideation without plan or intent, and insomnia. She stated that she gets anxiety with panic attacks as a response to vertigo, triggered by going out and "people move too fast." Tr. 517. Dr. Kolilis stated:

> She denies any perceptual problems such as auditory or visual hallucinations. She was oriented in all spheres. Other than tangential rambling, behavior this examiner deems her attempts to obfuscate, there were no obvious disruptions of attention or concentration, and her thought processes were otherwise sequential and logical. She was a guarded, vague, and poor historian. Her overall comprehension of language was good.

> She denies any significant problems with concentration or short-
> term memory....Her judgment was fairly good....Her ability to ab-
> stract was good.

*Id.*   Dr. Kolilis opined that Harlow was not a reliable historian.  He noted a prior diagnosis of

somatization, and stated that Harlow "does present herself in a histrionic, avoidant, and passive-

dependent manner, consistent with somatization.  Tr. 518.   He stated:

> Due to Ms. Harlow's uncooperative behavior, this examiner
> found it difficult to obtain the necessary information to assess
> the presence of any mental problems.  However, in regards to
> the specific points to be covered in this examination of anxiety
> and panic attacks, it is the opinion that she has the criteria to
> support an Adjustment Disorder With Mixed Anxiety and
> Depressed Mood related to the loss of her job and her father's
> death.  There is also a good possibility...that if the cause of her
> vertigo is vestibular then anxiety may be caused by a physical
> disorder.  In any case, she does not claim to have significant
> anxiety and panic except during in situations when she becomes
> dizzy.

*Id.*  Dr. Kililis noted that he was "unable to obtain enough reliable information" from Harlow to

assess her capabilities with accuracy.  *Id.*  He opined that

> "in the absence of marijuana use...she is capable of: understanding,
> remembering, and following at least simple one- to two-step instructions;
>
> sustaining concentration and attention, persisting in work-related activities,
>
> adapting to changes in routine, and engaging in appropriate social interactions.
>
> *Id.*

Dr. Kolilis estimated that Harlow was of average intelligence.  His Diagnostic

Impressions were Adjustment Disorder with Mixed Anxiety and Depressed Mood and Cannabis

Abuse.  Tr. 519.  He assessed her current GAF and highest GAF in the last year as 65.  *Id.*

The ALJ noted Dr. Kolilis's opinion and stated:

> Dr. Kolilis concluded that the claimant was able to work, as long as
> she did not use marijuana [citation omitted]. She could understand,
> remember and follow at least one-to-two step instructions; she could
> sustain attention and concentration; she could persist in work-related
> activities; she could adapt to changes in routine; and she could engage
> in appropriate social interactions.

Tr. 24.

Harlow argues that Dr. Kolilis found her limited to understanding, remembering, and following simple, 1-to2 step instructions, in the absence of marijuana use, and that this functional limitation renders her diagnosed Adjustment Disorder a severe impairment.

The Commissioner notes, as did the ALJ, that Dr. Kolilis found Harlow capable of remembering and following "at least" one-to-two step instructions. The ALJ properly noted that Dr. Kolilis assessed a GAF score of 65, both currently and for the past year. Tr. 24, 519. A GAF of 61-70 indicates "some mild symptoms (e.g., depressed mood or mild insomnia)...OR some difficulty in social, occupational, or school functioning...but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Rev. 2000) *(DSM-IV-TR)*.

The ALJ's determination that Dr. Kolilis did not find a severe mental impairment is supported by substantial evidence.

### (2) Peter LeBray, Ph.D.

Doctor LeBray reviewed the medical records and completed an August 2005 Psychiatric Review Technique ("PRT") form in which he opined that the claimant's mental impairment caused moderate functional limitations. Tr. 521-34. Dr. LeBray found Harlow had moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. Tr. 531.

6 - OPINION AND ORDER

The ALJ noted Dr. LeBray's opinion, and gave it "very little weight." Tr. 24.   The ALJ stated that Dr. LeBray "failed to provide clarity as to why" the claimant had moderate limitations. Tr. 24.  The ALJ noted that LeBray cited Dr. Kolilis's examination, but conflicted with Dr. Kolilis who found that Harlow was able to concentrate, attend and interact appropriately. *Id.*

The ALJ found that Dr. LeBray's opinion was entitled to little weight, in part, because Dr. LeBray did not assess Harlow's limitations with and without the influence of marijuana. This assertion is an error, but it is harmless as the ALJ was entitled to give more weight to examining Dr. Kolilis than reviewing Dr. LeBray.

The ALJ offered specific and legitimate reasons to give Dr. LeBray's opinion little weight.

### (3)  Karen Bates-Smith, Ph.D.

Dr. Bates-Smith examined Harlow in April 2008 and diagnosed a conversion disorder. Tr. 102-12.  Dr. Bates-Smith stated:

> First, there is one or more symptoms or deficits affecting voluntary motor or sensory function that suggest a neurological condition. Psychological factors likely are associated with the condition.  I do not believe the symptoms are intentionally produced.  Per two recent physical exams, the symptoms do not seem to be fully explained by a general medical condition.  The symptoms cause clinically significant distress or impairment in social and occupational functioning.

Tr. 108.

Dr. Bates-Smith thought that Harlow was moderately limited in her ability to understand, remember, and carry out complex instructions, make judgments on complex work-related decision, interact appropriately with the public, and respond appropriately to usual work situations and to changes in a routine work situation.  Tr. 110-11. She opined that Harlow would

be unable to complete a normal work day or week without significant interference from the

conversion disorder and would be likely to call in sick. Tr. 111.

The ALJ cited Dr. Bates-Smith's opinion, and stated:

> Her conclusion, however, is based on a faulty foundation. While Dr. Bates-Smith did not believe the symptoms were intentionally produced, Dr. Shults and Dr. Egan clearly established the voluntary nature of the claimant's symptoms. Additionally, Dr. Bates-Smith saw the claimant 2 ½ years after her date last insured. If a conversion disorder existed in April 2008, there is no evidence that it existed on or before the date last insured.

> ...Dr. McDevitt, the medical expert, initially testified that a conversion disorder existed....Dr. McDevitt leaned toward a global disorder but he believed the claimant's behavior was involuntary.

> However, the medical expert's testimony, in full, weighed on the side of no severe impairment. He testified that although the claimant had been dysfunctional, no etiology had been established for this result. Dr. McDevitt stated that he would be hard pressed to find an absolute medical disorder that was fixed. Instead, he was unable to find any evidence of an organic disorder to cause the claimant's loss of function and that the evidence of an emotional disorder was inferential with no clear cut medical findings.

> Further questioning led the medical expert to admit that there was insufficient evidence from treating sources to reach the conclusion that a conversion disorder existed. Although Dr. McDevitt said that he thought the symptoms were involuntary, he would not put his professional reputation on that conclusion.

Tr. 26.

Harlow argues that Dr. Shults and Dr. Egan are eye doctors and not psychiatrists. Although this is true, it is not a valid reason to discount their perception that Harlow's symptoms were voluntary. Dr. Egan stated, in October 2002, that Harlow was "poorly cooperative" and had

"convergence spasm and voluntary nystagmus manifested by fluttering eyelid and eye

movements. These are completely volitional." Tr. 310.

William Shults, M.D., examined Harlow in August 2008. He stated:

> Ms. Harlow exhibited chorieform movements throughout the course
> of today's examination. As her examination progressed so did the
> intensity and frequency of these movements. I will defer to others
> to comment on the origin of such movements, but, given her ocular
> findings, there is a strong likelihood that the movements are not
> organically based. Ms. Harlow did not have frequent eyelid blinking
> when she first entered my exam room wearing sunglasses; however,
> as soon as the eye examination began, her blinking started with a
> vengeance and persisted throughout the course of the examination.
> The blinking appeared volitional ie was not that seen with benign
> essential bleharospasm or hemifacial spasm....She'doth protest too
> much' in trying to impress the examinaer [sic] with her visual
> incapacity....Ms. Harlow's examination is devoid of any organic
> explanation for her visual complaints and I believe that her visual
> symptoms are entirely functional in nature.

Tr. 295-96.

Dr. Shults stated that the claimant "claims inability to see 20/400 with either eye. There

are no objective examination findings which support visual function at this level. There is a

distinct probability that patient is malingering with respect to claimed visual impairments." Tr.

303. Finally, Dr. Shults noted that Dr. Egan found convergence spasm and voluntary nystagmus,

"two classical signs of functional (non-organic) ocular motility 'abnormalities.' That such

findings were not seen at the time of my examination reinforces their voluntary nature." Tr. 308.

Harlow cites the testimony of Robert McDevitt, M.D., a psychiatrist who testified as a

medical expert. Tr. 636-654. Dr. McDevitt testified that he had observed Harlow and that "her

movements are unphysiological, are not associated with any known neurological disorder that I

know of. I suspect what she has is what is a histrionic conversion reaction, very reminiscent of

the days of Charcot [phonetic] and the original description of grand hysteria." Tr. 639. When

asked whether he agreed that Harlow has a conversion disorder, Dr. McDevitt stated "Yeah, it's

–I'm sorry, that's a bit narrow. She has more of a global disorder that involves more than one

body system...I guess for shorthand one could call it conversion disorder." Tr. 642. Dr.

McDevitt noted that Dr. Bates-Smith reported factitious behavior, and stated:

> I think we still have some unanswered questions here, to be
> honest with you. And I think part of the unanswered question
> is the definitive evaluation of whatever this is and I think plus
> the possibility of –I don't see – in general I think many medical
> physicians feel that people do this fo secondary gain, factually
> this is not necessarily an issue it is a physical expression of an
> emotional conflict sometimes, with resolve to that conflict and
> that's really what a conversion disorder's about but conversion
> disorders can be of psychotic, neurotic, or characterological
> origin so it's not necessarily–I would be hard pressed with the
> evidence I have here-with all respect to Dr. Bates-Smith and
> Dr. Colleles, to just make the diagnosis on that evidence without,
> again, an ENG–the definitive ENG which would then–and then
> a definitive in-depth study of what's going on conflictually with
> this individual.

Tr. 646.

The ALJ cited specific and legitimate reasons for discrediting one examining physician in

favor of two others.

## II.  Lay Testimony

The ALJ has a duty to consider lay witness testimony. 20 C.F.R. § 404.1513(d);

404.1545(a)(3); 416.945(a)(3); 416.913(d); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

Friends and family members in a position to observe the claimant's symptoms and daily activities

are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918-

19 (9th Cir. 1993). The ALJ may not reject such testimony without comment and must give

10  - OPINION AND ORDER

reasons germane to the witness for rejecting her testimony. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). However, inconsistency with the medical evidence may constitute a germane reason. *Lewis*, 236 F.3d at 512. The ALJ may also reject lay testimony predicated upon the testimony of a claimant properly found not credible. *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009).

### A. Robert Reiker

Harlow's landlord and roommate, Robert Reiker, provided a December 2004 statement in which he stated that the claimant spent most of her time sleeping, watching television, and talking. Tr. 366. Most of the restrictions he describe relate to Harlow's physical activity. He stated that Harlow socialized regularly with friends on the telephone and in person, and that she had no trouble getting along with others. Tr. 370-71. He did not describe any significant mental limitations.

The ALJ noted Mr. Reiker's statement, and properly concluded that it did not establish the existence of a severe impairment. Tr. 30.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

11  - OPINION AND ORDER

**B.  Bridget Wright**

Ms. Wright filled out a Function Report in December 2004.  She stated that she helped Harlow fill out forms at social service agencies.  Tr. 375.  She describes vertigo, nausea, and vision issues, all of which are based on Harlow's subjective reports, which the ALJ properly found not credible.  Tr. 30.

## CONCLUSION

For the above reasons, the Commissioner's decision is affirmed and this matter is dismissed.

IT IS SO ORDERED.

Dated this ⎵⎵ day of October, 2012.

JAMES A. REDDEN
United States District Judge

12  - OPINION AND ORDER